Appellant is ready, you may begin. May it please the court, opposing counsel. My name is Chuck Davis and I'm here for the Illinois Farm Bureau, representing 80,000 farmer members throughout the state of Illinois, including those in the enumerated counties listed in this matter. I'm joined here today by appellate co-counsel, and by agreement of the appellant attorneys, Brian Kalb and I will be splitting our time equally today for oral argument. I will cover the case's history and Greenbelt's failure to satisfy the statutory prerequisites involved in Section 406A of the Public Utilities Act, Section 503, along with the provisions related to financial capability and the statutory deadline for exercising its certificate, what we'll call CPCM. Mr. Kalb will be discussing the unconstitutionality of Greenbelt's special legislation, which we'll refer to in our argument as B-5, the new Section B-5. Though we will be presenting argument on behalf of all appellants in this matter, the other appellant attorneys are present in the court today, including Mr. Nealon. Should he be needed to address any issues that the court would like addressed? One question I have, counsel. Has the Whit Mill Farm in Kansas been built? To my knowledge, it has not been built. That could be addressed at this point by the appellee, whether there have been developments since then, but as of the record. Is there anything in the record about that? No, there's not. It's a good question, and it lends itself to the history of this matter, which I will get into just a little bit. I'll call this Greenbelt 2.0. This project's back in front of the commission, and it's back in front of this court. It's back after it was sold by its parent company, Clean Line Energy Partners, to Invenergy. It was sold because of the failed CPCNs that were issued to both it, Greenbelt, previously under previous ownership, and to Rock Island. In the past, Rock Island was a line that went in the northern part of the state. Rock Island had their CPCN overturned at the Illinois Supreme Court, and Greenbelt had their CPCN overturned by this court. The issues in those are relevant to today for a number of reasons. The Supreme Court found that Rock Island was not for the public use, and that a public utility, that if it did not have present ownership of property, it was not considered a public utility at the time of filing or at the issuance of the order. And then in this case, or in this court, in the original Rock Island, in the original Greenbelt matter, this court ruled that the fast-tracked construction procedure, application procedure of 406.1, was not available to non-public utilities, only existing public utilities. Counsel, along that line, following our case, it's my understanding that GBX was sold to Invenergy, a Chicago firm, was Rock Island, Windline also sold to the same firm. To my knowledge, no. To my knowledge, that project has been abandoned and is out of business. So the solution to the problems that they sought, this was the same business plan for all of these before the special legislation we're going to talk about today, was a build-it-and-they-will-come approach. If they can get approvals throughout the states for these projects, they can sign up customers, and then maybe these wind farms will be built on the western part of the country, in this case, in Kansas. What's the problem with that from a farmer's perspective? It's a cloud on farmer's title. Throughout this entire process, they go through regulatory proceedings in Missouri and Illinois and other places, and in doing that, the whole quest is for eminent domain. They need this assurance in order to get financial commitments and in order for those wind farms that you referenced to be built out west. Didn't the commission basically say that there were no indication that eminent domain was going to be used when they okayed this? They did say that, but... How could they say that, because if my understanding is correct, there was already letters sent to the affected landowners basically saying there's going to be eminent domain if you don't agree to our terms. Your Honor, we are aware of the same letters, and we are equally baffled by this. That is exactly what's been occurring, and I know that in this case and in others, there have been claims that they're not seeking eminent domain at that time, but it takes kind of a diagram of the Public Utilities Act to understand why that does not make sense. It does not make sense because otherwise... So 503 authority, Section 503, the direction to construct the project, that's something that's required in order to get what's called 509 authority. So 509 authority is the eminent domain procedure that happens in front of the ICC. There are certain steps within the Act that have to be followed. They have to show that they've exhausted all measures to get to that point. They would not be in front of the commissions of multiple states if they did not want eminent domain authority, if they cannot get negotiated easements. Otherwise, they can build this as a private project. There's no other reason to do this, and so that's why they're putting this notice out to the landowners is to set the table for the future so that way they can meet their milestones and hopefully get financing and hopefully get these wind farms go up. The problems that they encountered with the courts, their solution after purchasing the company from the old Greenbelt owners was to change the legislation, and changing the legislation to fix the issues they had before. The issues they had before were to say that it was not for public use. That has now changed. It's an automatic grant under the new B-5, and for present ownership of property, that was taken out. So for the first time ever, there was special legislation to the Public Utilities Act to benefit one party, one company, in a few counties to the detriment of all Illinois farmers. I'm short on my time, and I'm splitting with Mr. Kalb today. I'd be happy to answer questions and reply, but I think this is the perfect time for him to address the unconstitutional nature of this unless you have any other questions for me. I have another question, and that is these windmills produce alternating current. Is that right? Correct. And their reason for this transmission line is because they're slim to make that or turn that into direct current. Is that right? That's correct. So if they don't change it into direct current, it can be transmitted through existing lines. Is that correct? I believe that to be the case. I'm not an electrical engineer, but I do believe that to be correct, as is stated in the record. Okay. Thank you, counsel. Justice McHaney, do you have any other questions? No. All right. Thank you. Thank you. Thank you. Hey, Maureen. My name is Brian Cowell for the Concerned People Alliance. I will be addressing the appellant's challenges to the constitutionality of B-5 of the Public Utilities Act based on the special legislation, equal protection, and separation of power provisions of the Illinois Constitution. As an initial matter, this court has jurisdiction to consider these claims pursuant to Section 10-201 of the Act. In Ameren Transmission Company of Illinois v. Hutchings, the Illinois Supreme Court specifically held that Section 10-201 reserves to the appellate court the question of whether proceedings leading to a final decision of the commission were in violation of the state constitution. Here, the appellants challenge the constitutionality of the proceedings outlined in B-5 in this court. The appellants assert to this court that B-5 violates the special legislation clause in the Illinois Constitution under a rational basis test. The purpose of the special legislation clause is to prevent arbitrary legislative classifications that discriminate in favor of a select group without a reasonable basis. As it relates to the equal protection clause, the appellants also assert a challenge under that clause and the equal protection guarantee and the special legislation prescriptions are judged by the same, or generally the same standard. The determination of whether a law runs afoul of the special legislation clause requires a two-part test. The first question is whether the statutory classification discriminates in favor of a particular person or group, and second, whether that classification is arbitrary. As Mr. Davis previously stated, Grain Belt had moved for a certificate under 8406-1 of the Act, and the court and concerned citizens reversed the commission's grant of a certificate because Grain Belt was not a public utility, which was the court deemed a prerequisite to obtain a certificate. In response, the General Assembly passed B-5, which is bespoke legislation intended only for Grain Belt, and indeed the transcripts of the House debates on the legislation reference Grain Belt by name. B-5 drastically changes the requirements for the issuance of a certificate. First, the statute in its application is for proposed transmission line projects that have a capacity of 1,000 megawatts or larger and a voltage of 345 kilovolts or greater. Once that's shown, the commission, according to B-5, must find that the proposal satisfies the criteria of 8406-B-1, which is a set of standards that previously required that a utility meet through an evidentiary showing. That's by the wayside under B-5. Second, if the application demonstrates that the project is designed to deliver electricity to a point on a grid in either the PJM or the MISO, Regional Transmission Organization, then that is deemed by statute to be for public use. So that means that a merchant line originating in Kansas and terminating in Indiana, so long as that termination point is on a grid in the PJM or MISO RTO, then the court deems that by PI a public use. Finally, B-5 requires that a project crosses nine enumerated counties and only nine enumerated counties. Notably, an application under this statute for a qualifying direct current project must be filed prior to December 31, 2023. That is that the intent of this regulation statute, to the extent it was for clean and renewable energy, the statute puts a stop on such applications as of December 31, 2023. Grain Belt is in a class by itself under B-5 because it is the only non-public utility that can construct and operate a merchant line in the state without evidence that the energy from the merchant line will benefit the citizens of Illinois. The legislation is inconsistent with the stated purpose of the act. The law has been settled for a century that a company that sells according to its own wishes, as B-5 allows grain belt to do. Didn't the ICC have to make a finding of some benefit to the citizens of Illinois? Under the statute, that benefit is deemed by PI. The statute says that if the connection is put into the PGM grid or the MISO grid, then it's deemed for public use. So the commission's role has been usurped by the General Assembly, by finding the General Assembly requiring that the connections into those grids be deemed for public use. Isn't that governed by the FERC? I don't know if that is regulated by them. I do know that the General Assembly required that the connection points at least connect to the grids. I don't know if there's a separate federal regulation on those two applications of MISO and PJM. Okay, where this crosses the river, talking about the Mississippi, where is that point? I believe that point is it is in Pike County. I'm not exactly sure what town it's near, but it crosses in Pike and ends in Clark and terminates. I see my time is limited. I just do want to state that not only is grain belt in a class by itself, but the landowners in the enumerated counties are similarly situated to all landowners in the state where a public utility is attempting to construct an electrical system through their properties. So that's the legislature that's created a classification of property owners who would be burdened by a qualifying project by a non-public utility, and a separate classification for all other property owners who will not be burdened and can never be burdened by such a project. I want to say that the classification is, indeed, arbitrary, because if the project was intended, as the governor's office has said, toward 100% clean energy, then why put a geographic limit on the projects under the statute? Why limit any project that's intended to promote renewable clean energy solely through these nine counties? Two, why put a time restriction on it? If it's intended for, as the governor's office says, 100% clean energy in the future, if this project and projects like it are intended to promote 100% clean energy, why have a cutoff of December 31, 2023? It would be completely an arbitrary time restriction. And, Your Honor, also, there would be no reason to limit the capacity of the lines of 1,000 megawatts or 345 kilovolts for a renewable project. There should be no limitation on the line capacity if there is truly renewable energy being passed through them. So for those reasons and for the additional reasons stated in our brief, Your Honor, I ask the court to reverse the commission's finding and vacate the certificate of public convenience and necessity. Thank you, Your Honor. Thank you. May it please the court. Good morning, Your Honors. My name is Brian Dodds. I'm Special Assistant Attorney General, appearing on behalf of the Illinois Commerce Commission in this matter. Counsel for Greenville, Mr. Stryker, and I will be dividing our time roughly equally, eight minutes to six minutes. And with my time, I'll address the constitutionality of Section 8406b-5 as well as some of the statutory interpretation issues referenced by opposing counsel. I read about counsel's last point. If it follows 100% clean energy, why limit it to nine counties? And why have a time limit? For the first question, it is not a limit. Actually, the B-5 provision states that to qualify for public use, it shall be 1,000 megawatts or larger. So that's a floor, not a ceiling. And furthermore, actually, what was Your Honor's second point to that question, if you mind repeating it? Well, he raised the limit to nine counties and the time limit. Well, the time limit is important because the legislature wanted to get this project going. In fact, the General Assembly was coordinating with the legislature in Kansas, Missouri, and Indiana, and the public utility commissions of those three states had already approved their leg of the project by the time that Greenville applied in July of 2022. And so the deadline was rationally related to the legislature's goal of actually getting this project moving in order to transmit that electricity. Did that answer Your Honor's question? Okay. Before turning to the merits of the constitutional issues, I just want to note that Greenville and the commission do disagree on jurisdiction. We agree with landowners that this Court has jurisdiction to address the constitutional issues for the reasons we articulated in our brief, namely 10-201 and the Hutchings decision. Turning to the merits issues, Section 8406B-5, the B-5 provision, was enacted as part of the Climate and Equitable Jobs Act, or CJO. This was a landmark bill amending 17 different statutes in dozens of ways, including the Public Utilities Act, transforming a lot of what we do at the commission, regulating electric transmission. All of this was with the goal of transitioning the state to 100% clean energy by 2050 and fostering the necessary infrastructure build-out that that entails, including high-voltage direct current lines. Well, the ICC's order, as I understand, says that it has to be, this project has to be fully funded before construction can begin. Is that correct? That's correct. That's the revised financing condition. How can the ICC defer that finding and we still have jurisdiction? So, in order to build and operate this type of transmission project, you need a few different certificates from us. You need an 8406 or 8406.1 CPCN to do business in the state. You need 8503 authority to construct. Both of those have been issued in the land. And you need access to actual land, either negotiating easement rights with landowners or eminent domain authority. All of those steps are articulated differently in the Public Utilities Act. And here, the condition, the revised financing condition, is really just an assurance and a protection for landowners that they won't be burdened with stranded assets that provide no benefit to the state but have a ton of infrastructure. The court has jurisdiction because this is a multistage process, conferring that authority. Now, nobody really contests that CJA itself and the goals articulated were a legitimate exercise of the General Assembly's police powers to protect the health and well-being of the citizens. What landowners contest is three constitutional challenges, none of which withstand any kind of scrutiny. And the parties do agree that rational basis is appropriate here. The first two constitutional challenges, the special legislation, equal protection, counsel is correct. It's judged under the same standard. Was there discrimination? And was that discrimination arbitrary? And they fail on both of those counts because they have not, and the Supreme Court in Big Sky versus Illinois Bell articulated this, they have not identified a comparator class to Great Belt. That is their burden to show constitutional discrimination. They haven't shown a similarly situated public utility or another merchant transmission company would have been able to run a high-voltage line but was excluded from doing so by virtue of the terms of B-5. Having failed to show that, they cannot show a separation of power, excuse me, a special legislation or equal protection challenge. Even if there was discrimination, though, it certainly wasn't arbitrary. And I'll invite the court actually to look at the record here. There are a couple of helpful exhibits, namely Exhibit Volume 11 at E1529. That shows a regional map of high-voltage infrastructure in Missouri, Illinois, and Indiana. And it also shows the proposed AC to DC converter stations in Rawls County, Missouri, just over the Illinois border, and the AEP connection to PJM in Indiana. If you are faced with a finite universe of high-voltage lines in Missouri and Indiana, how to connect them, one rational way would be a straight line. That is precisely what the nine enumerated counties are. If you look at a map, and there's one available at E2240 in the record, Exhibit Volume 15, if you look at a map of the nine enumerated counties from Pike County to Clark, the Mississippi River, to the Indiana border, they form roughly a straight line across the state. That is rational relation to a legitimate government interest, and those two constitutional issues fail for that reason. Furthermore, there's no separation of powers problem here because there's no encroachment on the judiciary. The finding of public use by the commission under the Eminent Domain Act is a presumptive finding, and landowners at page 24 of their brief acknowledge this. It is a presumptive, a rebuttal presumption of public use. You rebut that presumption through a traverse in a circuit court of the relevant county. That has not changed. Grain Belt is situated precisely the same as a public utility other than the D.C. Union CPC, and landowners will be able to challenge that public use determination in circuit court. Can you explain the financial benefit to the citizens of Illinois for this project? Your Honor, the particular financial benefits might be covered by my counsel over here. I will say very briefly that the legislature has articulated the benefits to Illinois residents at 20 ILCS 3855, particularly subpoint 10.5 lists the bringing of good-paying jobs to the state, increased resiliency on the grid, including for Illinois residents, fostering clean energy generation, and the connection between western and eastern interconnections to make a more reliable grid. Doesn't it also highly rely on the price drop and credits and things of this nature that are all very up in the wind, if you will? Who knows if that will take place in the future or not? I think that's correct, Your Honor. I see I've run out of time to answer. There is some uncertainty in the project going forward. That's why they wanted to allow particularly for 60 months to complete it and why they wanted the financing up front before any infrastructure is put in the ground. But on that point, the legislature has articulated a goal of transitioning the state to 100% renewable energy and building high-voltage direct current lines in the state. That was a valid expression of their police powers. There are no constitutional issues with that finding, and that's really a factual finding for the legislature. If there are no further questions, I'll leave the balance of my time to counsel. Good morning, Honors. Good morning. My name is David Stryker, and I represent the Appalachian Grand Belt Express. I think where you left it with Mr. Dodds is a good transition to some of the things I'd like to talk about with the Court this morning. Your Honor asked about the benefits of the project, and the benefits of the project are multifold. Starting with, Judge, understanding that there's three criteria that we had to prove, one, that there is benefit to the public, two, that we can adequately construct the project, and three, that we can adequately finance the project. As the Court noted and the previous reviewers discussed, the legislation at issue does direct a finding with regard to criteria F1. However, we did not want to leave the commission in the position of having to guess what the benefits are, even though it did not have to take testimony on those specific benefits, and the benefits are lengthy. I would refer to the Court to pages 6 and 7 of our brief, where we note that it's not just pricing benefits, Your Honor. This line exists to connect PJM and MISO, as Mr. Dodds said, and come from southwest Kansas and bring that power here to benefit Illinois consumers. It is not only benefits of meeting increased demand. It's also, and there's significant reliability benefits to this line in case of power outage to bring new power, diverse sources of power into Illinois. This project will lower costs to Illinois consumers. There was direct testimony in the record that's going to happen. How is that determined? There was an expert, Grainbill presented an expert, Mr. Retscher. Mr. Retscher ran a cost study, and it was a cost study aimed at determining what specific pricing benefits would be provided to Illinois consumers. There was also a second expert, Mr. Goggin, from the Clean Grid Alliance, that also opined that the project would provide cost benefits to Illinois consumers. Your Honor, I asked Mr. Dodds with regard to the assumptions that Mr. Retscher used in his calculations. One of those assumptions, Judge, was that there would be a benefit to carbon-free electricity. And he ran that assumption, as he pointed out in the record, because that's how MISO, the controlling RTO, runs the assumption, and that's because that's how Ameren run the assumption. He was also asked to cross-exam. As you can imagine, this witness was subject to thorough cross, whether without that assumption being made, there would still be pricing benefits to Illinois consumers. His answer was yes, that would be directionally similar, and that was again backed up by a separate witness, uncontested, Mr. Goggin from the Clean Grid Alliance. And I think it's telling, Your Honors, that on page 18 of the landowner's brief, they note that we provided significant testimony with regard to the public benefits of the project. They referenced that we provided seven single-spaced pages with regard to those benefits that included the ones I mentioned, also other benefits like national security. Our national security and security of this country rests on the soundness of the electricity grid and the ability to move power between regions. That is a significant benefit of this project, and as Mr. Dodds mentioned, that's a benefit that was specifically spelled out by the General Assembly in the new Clean Energy Jobs Act. I did want to touch on the jurisdictional issues with Your Honor, because we stand fully side-by-side with the Commission on every issue in the brief. The legislation at issue is clearly constitutional, and we believe the appellants' arguments fail. We believe the order stands on its own, and there was sufficient evidence, and the proper interpretations were made. The only difference between us and the Commission is the jurisdictional issue, and we do think it's important to point out to this Court that the same constitutional challenges have been brought by appellants in a circuit court action that was filed in October of 2022. This Court sits here in administrative review. The Supreme Court's decision in Landowner Alliance v. ICC in 2017 spelled that out. It's also spelled out in Section 10-201 of the Public Utilities Act, and furthermore, Supreme Court Rule 335 says it's the record on appeal that comes up before this Court. The constitutionality question was not considered by the Commission. In fact, it could not consider the constitutionality of its own enabling statute. Counsel for the Commission points out in his brief that as long as the issue was raised before the Commission and essentially a placeholder was held, this Court would have jurisdiction. We have not seen any direct authority either in statute or case law to support that provision. Therefore, we do believe it's necessary to bring the jurisdictional issue to this Court's attention. Based on the other cases pending in circuit court, it clearly has jurisdiction. We have not challenged jurisdiction there. Appellants filed the case, they clearly think that there is jurisdiction. And I'm happy to answer any of the other questions. The expert witness you referenced, the expert testimony, say that our national security is dependent upon a wind farm? It's not dependent upon a wind farm. I believe what the expert testimony was about was the strength and resiliency of the electric grid. It's important to support national security, and as the General Assembly has found, moving large amounts of power, bulk transmission between RTOs is something that benefits consumers, benefits national security, and provides a significant public use and public benefit. And that's what the Illinois Commerce Commission found in its order. Okay. Thank you, Your Honor. Thank you. I'll come instead of five minutes. Your Honor, looking backwards from Mr. Stryker's argument, I'd like to mention that the pending case before the St. Circuit Court of Sangamon County, that case has been stayed pending a determination by this Court of the constitutional issues, and the judge is waiting to determine whether to proceed based on this Court's ruling on those constitutional issues. And I cited to the Court the Amron v. Hutchings case that states and holds that this Court, on review from the Commission's decision, has appellate jurisdiction. Your Honor, the attorney for the Commerce Commission attempted to answer Judge McHaney's question about the timeframe or the deadline for a project under v. 5, and in response, the attorney stated that the reason that that deadline of December 31, 2023, was in the statute was because they wanted to get this project going, as if the General Assembly wanted to kick-start a project for a private entity in the state of Illinois. That does not answer the question of the legislative purpose of v. 5, which is to promote renewable energy and have 100% clean energy by, I believe the date was 2050. I may misremember that. But the statute v. 5 may be a nudge to Greenbelt to get its project off the ground, but it is a wall for all other utilities or private utilities to put in transmission lines to promote renewable energy in the state of Illinois. And the statement about why the geographic limitation of just the nine counties, that's arbitrary, too, because the Commission makes its own fact findings on the best location for a transmission line project. And we know under the special legislation analysis, where a general law would apply, a special law is unnecessary and unconstitutional. So the Commission would make its own factual determination on the location of any project in the state of Illinois, a transmission line project. And if it was truly intended to promote renewable energy in the state of Illinois, then there would be no geographic limitation because other utilities, other projects, could put lines in other places. Like if you wanted to use renewable energy from sources in, say, Wyoming or further north, go directly to Chicago, under this statute, any applicant would have to route the line south to Pike County. It wouldn't make any sense. And so, Your Honor, the appellants contend that this is an arbitrary distinction and a specific legislation where it's unnecessary. And the statute also thwarts the goal of clean energy. Mr. Dowd states that the comparative class is not shown here. He did not mention that there are landowners who are named as a class in the statute who are compared to other landowners. Landowners in the nine enumerated counties are a classification, an arbitrary classification, compared to all other landowners in the 93 counties of the state. And so there is a comparative class that's being discriminated against in favor of other landowners. And, Your Honor, to address the question about the funding, this case must be, we request the court reverse and vacate these certificates, and it must be until the funding issue that the court, Your Honor, had referenced is determined. And I see my time is up, and I'm going to turn my remaining time over to my colleague, Mr. Gross. Of the counsel at the table here today for both parties, there was one attorney that was present at the first hearing of the Rock Island Clean Line case at the commission, and there was one of us that stood up before this court in the last Greenbelt case, and that was me. I've seen these cases since the beginning, and I can tell you what has not changed, what the theme is of this applicant and of the commission. It's that they see the rules as a gray area. When you listen to the commission's attorney say today that this project was a priority, so they went to the legislature to get special legislation to get it done. When you look at the financing component of this project, they kicked the can. Again, there is an ex parte proceeding that's put into a financial contingency. There is not a present showing that they're financially capable. They come back and prove it later as some unknown proceeding that we have no say in as Illinois farmers. That's not what the rules say. The rules are clear that there needs to be a present showing of financial capability. And finally, subsection F of the statute is clear that a certificate needs to be exercised within two years, and instead five years was given. For all of those reasons and the reasons stated by Mr. Kalb, this order should be overturned and vacated, and I'd be happy to answer any questions. Thank you very much. Before I let you all leave, I just wanted to commend all the parties on the briefs that were presented to us. It's always nice on a complicated case or a case that involves as many people as this one does, to have competent briefs to review and good arguments as well from all the attorneys. For any landowners, any people that are here on behalf of either of the parties, I just want to point out that I think all of your attorneys have done a very good job today. And with the briefs, I'm not sure if Mr. Neelan is here, but I just wanted to point out, and this is just my personal observation, that I enjoyed your brief very much. I thought it was done very well, as were all the rest of them. This case will be considered, and we will issue our ruling in due course.